IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| ROBERT Z.,[1] | ) | |
|     Plaintiff, | ) | Civil Action No. 3:20-cv-00011 |
| v. | ) | |
| | ) | REPORT & RECOMMENDATION |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security, | ) | By:    Joel C. Hoppe |
|     Defendant. | ) |         United States Magistrate Judge |

Plaintiff Robert Z. asks this Court to review the Commissioner of Social Security's final decision denying his claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434, and supplemental security income ("SSI") under Title XVI of the Social Security Act, *id.* §§ 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' arguments, and the applicable law, I find that substantial evidence supports the denial of benefits. Accordingly, the Commissioner's final decision should be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

1

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe medical impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past

2

relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work existing in the economy. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[2] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In November 2016, Robert filed for DIB and SSI alleging that he had been unable to work since September 2013 because of seizures, type II diabetes, neuropathy in both hands, and a herniated disc in his lower back, among other medical conditions. *See* Administrative Record ("R.") 13, 80–81, 96–97, 249–52, 255–57, ECF No. 12. He later amended his alleged onset date ("AOD") to September 12, 2016. R. 16 (citing R. 51–52). Robert turned fifty years old, which is considered a person "closely approaching advanced age" under the regulations, on his amended AOD. *See* R. 37, 51–52, 80, 20 C.F.R. §§ 404.1563(d), 416.963(d). Disability Determination Services ("DDS"), the state agency, denied his claims initially in May 2017, R. 80–111, and upon reconsideration that December, R. 112–52. On October 16, 2018, Robert appeared with counsel and testified at an administrative hearing before ALJ Brian Rippel. *See* R. 46–79. A vocational expert ("VE") also testified at this hearing. R. 69–78.

ALJ Rippel issued an unfavorable decision on January 29, 2019. R. 13–38. At step one, he found that Robert held several part-time jobs after his amended AOD, but that those work attempts did not qualify as "substantial gainful activity." R. 16–17. Robert had numerous

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

"severe" medical impairments, including, as relevant here, "multi-level cervical spondylosis, stenosis, and neuroforaminal stenosis with bilateral upper extremity radiculopathy; bilateral upper extremity lateral epicondylitis; . . . right carpal tunnel syndrome (CTS); [and] left finger Dupuytren's contracture," R. 17. *See* Pl.'s Br. 1, 4–12 (arguing that ALJ Rippel "failed to build an accurate and logical bridge between the medical evidence" of Robert's upper extremity impairments and his findings that Robert could "occasionally" reach overhead bilaterally and "frequently" reach in other directions and handle bilaterally), ECF No. 14. Those impairments did not meet or medically equal the relevant Listings, R. 18, 20 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04, 11.14), because Robert generally had normal strength and sensation in his upper extremities, and his arm pain and weakness improved after having cervical spine surgery in early 2018, *see id.* (citing R. 942–61, 1501–05, 1594–95, 1690–95).

ALJ Rippel then evaluated Robert's residual functional capacity ("RFC") and found that he could perform "light work"[3] that accommodated multiple non-exertional limitations. R. 22. More specifically, Robert could "occasionally" lift/carry up to twenty pounds and "frequently"[4] lift/carry ten pounds; occasionally reach overhead bilaterally and frequently reach in other directions and handle bilaterally; occasionally climb ramps/stairs, but never climb ladders/ropes/scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; and have occasional

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b); *see* R. 22, 33–34 (citing R. 84, 88, 124–26, 145–47). A person who can meet these strength requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983); *see* R. 22.

[4] "'Occasionally' [or 'occasional'] means occurring from very little up to one-third of the time" and "should generally total no more than about 2 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). "'Frequent' [or 'frequently'] means occurring from one-third to two-thirds of the time," or about six hours during an eight-hour workday. *Id.* at *6. "Frequently" is more restrictive than "constantly," R. 72, or "unlimited," R. 124–25.

exposure to respiratory irritants, but no exposure to workplace hazards like moving machinery. R. 22. This RFC ruled out Robert's return to his past relevant work as a heavy-equipment mechanic. R. 37 (citing R. 70–72). Based on the VE's testimony, however, ALJ Rippel found that Robert was not disabled after September 2016 because he still could perform certain "light" occupations (merchandise marker, routing clerk, photocopy machine operator) that offered a significant number of jobs in the national economy. R. 38; *see* R. 72–78. The Appeals Council declined to review that decision, R. 1–4, and this appeal followed.

### III. Discussion

Robert primarily challenges ALJ Rippel's RFC finding that Robert could "occasionally" reach overhead bilaterally, but "frequently" reach in other directions and handle bilaterally. R. 22. *See generally* Pl.'s Br. 1, 4–12. He also faults the ALJ for not discussing his "exemplary work record" before concluding that Robert's "self-description of his limitations" was not entirely consistent with other evidence in the record. *Id.* at 14 (citing R. 29). His arguments are not persuasive.

*A.   Summary*

Robert worked for many years as a heavy-equipment mechanic. *See* R. 55–59, 70–71, 294–301. This "very heavy" work, R. 70–71, required him to lift 100 pounds and to reach, handle, and grasp objects for most of the workday, R. 294–300. Robert stopped working as a mechanic in 2012 or 2013, *see* R. 278, 294, 311, and worked full-time in the food-services industry until the summer of 2016, *see* R. 61, 84, 782. In July 2015, he had an EMG after reporting "some pain," R. 1044, and "sensory disturbance in his bilateral hands/arms," right worse than left, as well as "a bit of weakness on the right grip," R. 1019. *See also* R. 604–06. The abnormal results suggested "a moderate degree [r]ight distal median sensory motor

5

neuropathy across the wrist" consistent with moderate CTS. R. 1026. "There was no evidence of a focal neuropathy involving the left upper extremity, [or of] a more widespread neuropathy, myopathy, or cervical radiculopathy." *Id.* Robert's physical exams between August 2015 and July 2016 showed normal muscle strength, R. 714, 722, 730, 738, 747, 755, 763, 790, without evidence of tremors or tics, R. 776, 783. He did not report any specific problems with his upper extremities during this time. R. 466, 470, 593–94, 595–96, 713, 721, 737, 746, 756, 775.

In August 2016, Robert was in a serious car accident and stopped working for several months because he was not allowed to drive. *See* R. 61, 86, 934. He returned to "light" duty part-time work at fast-food restaurants around June 2017, *see* R. 53, 938, 1150, and worked part-time for most of the relevant period, *see, e.g.*, R. 65 (Oct. 2018); R. 1150 (July 2017); R. 1156 (Sept. 2017); R. 1177 (Oct. 2017); R. 1321 (Dec. 2017); R. 1438 (Aug. 2018). Robert told providers that he stayed "exhaustively busy" doing things around the house, R. 832 (Feb. 2017); *see* R. 938 (May 2017), including fixing cars, R. 1111 (Nov. 2017), woodworking, R. 1321, and renovating a bathroom, R. 837 (Jan. 2017); R. 934 (Mar. 2017). He reported "moderate shoulder pain . . . stem[ming] from exertion" in January 2017, R. 837, and "[s]ome decrease in grip with some numbness in his fingers" in March 2017, R. 933–34.

That May, Robert complained of "constant thumb/hand pain, tightness, and neuropathy that is worse with movement," and he reported having "trouble opening jars [and] bottles and operating heavy equipment." R. 932. Tylenol provided "intermittent relief." R. 932. On exam, Robert had full strength and range of motion, but "[c]ontractures/bone spurs [were] present at [the] MCP/DIP joints bilaterally" and he endorsed "[t]enderness to palpation to [the] radial/MCP joint." *Id.*; *see also* R. 926 (normal sensation, "good grip, no tenderness" in upper extremities) (Sept. 2017); R. 934 (normal strength and range of motion in upper extremities) (Mar. 2017). His

"primary care doctor put him on gabapentin" for upper-extremity pain and paresthesias, which helped to some extent. R. 1501; *see* R. 1449 ("[He] was started on gabapentin which provided some relief of the bilateral upper extremity pain and paresthesias but did not completely resolve this.").

The DDS physicians who reviewed Robert's records in May and December 2017 opined that he could occasionally lift, carry, push, and pull up to twenty pounds and frequently lift, carry, push, and pull ten pounds; sit and stand/walk for about six hours each in an eight-hour workday; and frequently balance and occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; but never climb ladders, ropes, or scaffolds; additionally, he should avoid concentrated exposure to workplace hazards. *See* R. 88–89, 104–05, 124–25, 145–46. They attributed these limitations to Robert's back pain, knee, pain, dizziness, and history of seizures. *See id.* They did not identify any impairment-related restrictions on Robert's ability to reach or use his hands. R. 89, 105, 125, 146; *see* R. 123, 144 ("[D]espite his reports of joint pain, he reported that he continues to build things, works parttime, and is able to clean and do household chores. . . . The RFC is reduced accordingly and remains with appropriate restrictions to compensate for the impairments and associated symptoms that can be medically determined.").

In December 2017, Robert saw an orthopedic surgeon about pain radiating "from his neck into the shoulders as well as elbow pain[,] numbness and tingling in his hands and a contracture of the left small finger." R. 1501; *see also* R. 1449 ("[S]tates he has had 2–3 years of neck pain with radiation into his bilateral upper extremities for about 8 months now.") (Jan. 2018). The neck and shoulder symptoms did "not necessarily" cause problems "with reaching for overhead things," but the elbow pain interfered with "gripping heavy items and twisting his forearm." R. 1501; *see also* R. 1442 ("[He] is having trouble with fine motor dexterity, and

7

decreased streng[th]. He has had difficulty working and using his hands for extended period[s] of time.") (Feb. 2018); R. 1444 ("[H]e has difficulty with grip, with repetitive movements and with stamina. He is only able to work 4–6 hours without significant pain in the elbow and decreased grip.") (Jan. 2018); R. 1449 ("[S]tates that over the last few months he has been dropping things, had difficulty operating [*sic*] jars, . . . as well as some clumsiness in his hand.") (Jan. 2018). The contracture was "becoming increasingly more bothersome and g[ot] in the way on a daily basis." R. 1501 (Dec. 2017). On exam, Robert had "somewhat restricted" range of motion and "mild" tenderness in the cervical spine; positive impingement signs, but full strength, near-full range of motion, and no evidence of atrophy in the shoulder; significant point tenderness and painful range of motion in the elbows; and a flexion contracture in the left small finger. R. 1503. X-rays showed "severe spondylosis of the cervical spine starting at C4, mild degenerative changes at the AC joint, and marke[d] enthesopathy related changes at the lateral epicondyle" in the elbow, "worse on the right." R. 1502. The surgeon ordered an MRI and another EMG to evaluate "interval progression of the neuropathic type symptoms" in Robert's right upper extremity and to determine whether he now "also ha[d] left-sided involvement." *Id.*; *see* R. 1026. The MRI confirmed "[s]evere cervical spondylosis . . . producing severe spinal canal stenosis at multiple levels, most pronounced at C4-C5," and "[m]oderate to severe neuroforaminal narrowing bilaterally from C3-C4 through C6-C7, most pronounced at C4-C5 and C5-C6." R. 1721.

  Robert's physical exams in early 2018 were normal expect for diminished strength in the left hand or shoulder, R. 1442, 1444, 1450, and limited extension in the left small finger, R. 1444. That January, a neurosurgeon recommended a C3-C7 anterior cervical discectomy and fusion "[g]iven [Robert's] difficulty with fine dexterity in his hands and neck pain with bilateral cervical radiculopathy." R. 1450. He talked to Robert "about undergoing light duty for 6 weeks

8

postop" and instructed him not to drive during this recovery time. R. 1450–51. Robert had surgery on February 21, 2018. *See* R. 1618. He was discharged home on February 26 with instructions to wear a cervical collar, to not engage in any "strenuous activities" or "work above [his] head or with [his] arms outstretched in front" of him, and to not lift "greater than 10 pounds for 6 weeks." R. 1620. He also could not drive or return to work until cleared by the surgeon. *Id.*

In April 2018, Robert told the neurosurgeon that "his neck and bilateral shoulder pain [were] significantly improved and nearly completely gone," and his upper extremity strength was also "significantly improved compared to" before surgery. R. 1594; *see also* R. 1441 ("The surgery resolved his shoulder pain enough that repair of the rotator cuff tears will likely wait. [H]as some improvement in hand pain/numbness but still not grip streng[th].") (Mar. 2018). On exam, he had full strength and intact sensation in both upper extremities. R. 1594. The surgeon noted that Robert had made a "good recovery" since surgery and instructed him to follow up in three months for repeat cervical spine X-rays. *Id.* ("Incision is healing well and postoperative films as expected with no hardware complications. Cervical collar cleared in clinic."). That July, Robert told his orthopedic surgeon that his elbow "was no longer bothering him," but he still had "some dysesthesias in the small and ring finger on the right hand." R. 1589. He denied neck pain and focal weakness, R. 1590, and said that the Dupuytren's contracture in the left small finger was "not really getting in the way" of his daily activities, R. 1592. A new EMG showed "[m]ild asymptomatic" right-sided CTS, R. 1591, and "very minimally symptomatic" left elbow epicondylitis, R. 1592 (July 2018). It did "not show any significant compressive neuropathy in the upper extremity warranting any urgent intervention or follow-up." R. 1592. Robert went back to work at a fast-food restaurant in early August, about five months after his neck surgery. *See* R. 1438 ("He was off work due to cervical neck surgery but is now back at work in a fast food

9

facility.") (Aug. 10, 2018).

On October 12, 2018, Robert reported that he was "quite active" and that "pain ha[d] not significantly limited his daily activities," except when he "overexert[ed]" himself. R. 1799. He still had some "baseline weakness in his arms and hands," which "occasionally" caused him to drop things. *Id.* ("Says this is better since surgery."). His exam that day showed full strength and intact sensation throughout. R. 1802–03. Four days later, Robert testified at the ALJ hearing that he could lift a gallon of milk, R. 62–63, and use his hands to "roll a burrito or make a taco" at his part-time job, R. 65. He "tend[ed] to drop things quite a bit," however, because he did not have the strength, feeling, and dexterity in his hands "that [he] used to have." R. 63 *see* R. 370 ("I still try to build things but it takes much longer and the results are not what they were.") (Dec. 2017). Repetitively lifting or carrying "any kind of weight" also caused "a lot of pain." R. 64; *see* R. 66 ("I have to make sure I really hold something to carry it or to lift it."); R. 373 ("I am unable to lift & carry weight I was able to before.") (Dec. 2017).

*

ALJ Rippel discussed this evidence throughout his written decision. R. 16–18, 20, 22–29, 30–35; *see* Pl.'s Br. 11 ("While [Robert] does not dispute that the ALJ discussed the relevant medical evidence, the ALJ failed to 'build an accurate and logical bridge' from this evidence to his conclusion that [Robert] can frequently reach (in directions other than overhead) and handle." (internal citation omitted)). He rejected the DDS physicians' medical opinions that Robert had no medically determinable manipulative limitations, R. 89, 105, 123, 125, 142, 144, because those opinions were inconsistent with more recent objective evidence showing "significant cervical spine and upper extremities deficits . . . that required surgery" in February 2018, R. 34. *See* SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996) ("If the RFC assessment conflicts with an opinion

10

from a medical source, the [ALJ] must explain why the opinion was not adopted."). He also considered the neurosurgeon's discharge instructions, which restricted Robert's abilities to work, drive, engage in strenuous activity, and do "work above [his] head or with [his] arms outstretched" after surgery, but found that those limitations were not meant to be permanent and seemed at odds with postoperative exams showing "good arm strength and sensation," as well as Robert's reports that he saw "significantly improved pain and strength," R. 35 (citing R. 1594–95, 1620).

ALJ Rippel also found that Robert's impairments could reasonably be expected to cause his alleged upper-extremity symptoms, but that his statements describing their intensity, persistence, or functionally limiting effects were "not entirely consistent with the medical and other evidence in the record," R. 29. *See* R. 31, 33. First, although diagnostic studies showed mild to severe abnormalities in Robert's cervical spine and upper extremities, R. 31 (citing R. 1004, 1014–26, 1501–05, 1720–23), physical exams revealed "mixed" normal and slightly abnormal strength, sensation, and/or range of motion in his neck, shoulders, elbows, and hands, *id.* (citing R. 931–32, 1618–50). *See also* R. 714, 722, 730, 738, 747, 755, 763, 790, 926, 934, 1442, 1444, 1450, 1503, 1592, 1594, 1802–03. Second, Robert told providers that his pain, strength, and sensation improved significantly—and even resolved for a time—after his neck surgery in February 2018. He also reported that "conservative treatment [with] gabapentin" and over-the-counter pain medications provided some relief. R. 31 (citing R. 931–32, 950–51, 974–1006); *see also* R. 1449, 1501. Third, Robert's "wide range of daily activities" during the relevant time, including part-time work at several fast-food restaurants, home-improvement projects, woodworking, and fixing cars, indicated that he was "not as limited as alleged." R. 33 (citing R. 832, 837, 934, 938, 1111, 1150, 1156, 1177, 1321, 1438, 1799). Robert's ability to

engage in these activities, along with "mixed signs" on physical exams and his "positive response" to neck surgery and other, less aggressive treatment, supported a finding that he still could "perform light work with additional reaching, handling, and workplace hazard restrictions." R. 31.

B.    Analysis

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his impairments and symptoms.[5] SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted). The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional limitation that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should incorporate "restrictions caused by medical impairments and their related symptoms," including pain, that affect the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015). Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will

---

[5] "Symptoms" are the claimant's own description of his medical impairment. 20 C.F.R. §§ 404.1502(i), 416.902(n) (2019).

affirm the ALJ's RFC findings, including a decision to reject an alleged functional limitation, when it is clear that he considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and he built an "accurate and logical bridge from that evidence to his conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018).

ALJ Rippel's decision satisfies this "deferential" standard of review. *Jarvis v. Berryhill*, 697 F. App'x 251, 252 (4th Cir. 2017). First, he clearly found that Robert's neck and upper-extremity impairments and related symptoms meant that Robert could not reach and handle for eight hours a day, five days a week. R. 22, 29–31, 34–35; *see* R. 72 ("[B]ilateral overhead reaching limited to occasional, bilateral reaching other than overhead and bilateral handling limited to frequent, those could not be performed constantly."). Having made this finding, ALJ Rippel needed to consider all the relevant evidence in Robert's record in order to determine "the 'maximum degrees to which [he] retain[ed] the capacity,'" *Mastro v. Apfel*, 270 F.3d 171, 179 (4th Cir. 2001) (quoting 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(c)), for sustained reaching and handling to perform work-related activities. Here, ALJ Rippel concluded that Robert could reach overhead for at most "one-third of the time," generally about two hours, and reach in other directions and handle for "one-third to two-thirds of the time," or about six hours, during the course of a normal eight-hour workday, SSR 83-10, 1983 WL 31251, at *5–6. *See* R. 22.

Robert asserts that the ALJ merely "list[ed] the evidence and then [went] straight to his conclusion" about Robert's manipulative capacities "without a reasonable or logical explanation as to how he got there." Pl.'s Br. 12. I disagree. ALJ Rippel cited specific medical and other relevant evidence in Robert's record—most notably his positive response to neck surgery, his "wide range of daily activities" involving the upper extremities, and physical exams consistently

13

showing normal upper-extremity strength and sensation—to support his finding that Robert could "occasionally" reach overhead bilaterally and "frequently" reach in other directions and handle bilaterally. R. 22, 31, 33; *cf. Hall v. Saul*, No. 1:19cv1637, 2020 WL 6156535, at *7–9 (D.S.C. Oct. 21, 2020) (substantial evidence supported RFC limiting claimant with severe bilateral CTS and rotator cuff tendinopathy to "frequent bilateral handling" where treatment notes showed claimant "exhibited normal strength and sensation with no atrophy of bilateral upper extremities," he "denied problems with tingling, muscle pain, or muscle weakness" after CTS surgery, and, aside from the hand surgeon who restricted claimant "to no heavy lifting or grasping" immediately after surgery, none of the other doctors "who saw him for his shoulder, neck, and wrist pain" identified any manipulative restrictions); *Joe S. v. Comm'r of Soc. Sec.*, No. 3:19cv25, 2020 WL7024499, at *2, *4–5 (W.D. Va. Nov. 30, 2020) (substantial evidence supported RFC limiting claimant with severe cervical spine disorder and bilateral upper-extremity impairments "to 'frequently' using his arms and hands to push/pull and handle/finger" where claimant usually exhibited normal strength and sensation, reported that medication and injections provided some pain relief, and "told his doctor that he was 'always doing stuff around the house'"). The ALJ also explained that the DDS physicians' medical opinions that Robert had no medically determinable manipulative limitations were not restrictive enough considering more recent medical evidence, R. 34, but that the record also did not suggest Robert should avoid reaching and handling throughout the relevant period, R. 35 (citing R. 1620). *Cf. Jakupczyk v. Astrue*, No. 7:12cv405, 2014 WL 550556, at *4 (W.D. Va. Feb. 11, 2014) ("As the fact finder, the ALJ is entitled to weigh the conflicting medical opinions of the record and determine an RFC that was a compromise between them—the ALJ did so here, largely crediting the more restrictive opinion of record, but not entirely rejecting the less restrictive ones."). This evidence supports

14

the RFC assessment. *Hall*, 2020 WL 6156535, at *7–9; *Joe S.*, 2020 WL7024499, at *4–5; *see also Gross v. Heckler*, 785 F.2d 1163, 1165–66 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."); *Green v. Astrue*, No. 3:10cv764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11, 2011) ("An individual does not have to be pain-free in order to be found 'not disabled,'" especially where the ALJ found the claimant could not return to more physically demanding past work), *adopted by* 2011 WL 559421 (E.D. Va. Nov. 17, 2011).

Robert asserts that his "testimony and the underlying record demonstrate that he cannot" use his upper extremities to reach (other than overhead) and handle "for two-thirds of an 8-hour workday." Pl.'s Br. 12 (emphasis omitted). *But see* R. 63, 65, 66, 1799. Even assuming Robert's statements suggest that he should be limited to "occasional" reaching and handling, Pl.'s Br. 6–7 (citing R. 63–65, 77–78), ALJ Rippel's decision makes clear he found those statements were "not entirely consistent" with relevant medical and other evidence in the record, R. 29. *See* R. 31, 33. ALJ Rippel cited relevant "contradictory testimony and evidence in analyzing [Robert's] credibility," *Bishop v. Colvin*, 583 F. App'x 65, 68 (4th Cir. 2014), and Robert does not directly challenge the specific, legitimate reasons ALJ Rippel gave for discounting his testimony, *see* Pl.'s Br. 14–15 (asserting that the regulations "require consideration of a claimant's historical willingness to work" and that ALJ Rippel's failure to discuss Robert's "exemplary work history" is reversible error).[6] Moreover, contrary to Robert's suggestion that ALJ Rippel did not consider

---

[6] ALJs should consider a claimant's work history when evaluating his or her symptoms. *See Locker v. Berryhill*, No. 2:17cv342, 2018 WL 4232889, at *7–8 (E.D. Va. July 6, 2018), *adopted by* 2018 WL 4224852 (E.D. Va. Sept. 5, 2018); SSR 16-3p, 2016 WL 1119029, at *6 (Mar. 16, 2016). ALJ Rippel discussed Robert's extensive work history during the administrative hearing, *see* R. 55–58, referenced specific past occupations in his decision, R. 37, and averred that he carefully considered "the entire record" in making his factual findings, R. 16. This is sufficient to show that ALJ Rippel "considered" Robert's work history as part of the RFC assessment. *See,*

15

the fact that he "continued to engage in part-time work, albeit at less than [SGA] levels, in order to support himself," Pl.'s Br. 14, the ALJ specifically cited Robert's ability to work part-time at fast-food restaurants after his AOD as one of several reasons why he retained the RFC for light work with manipulative limitations, R. 33. *See Rowland v. Colvin*, No. 4:13cv7, 2014 WL 2215884, at *11–12 (W.D. Va. May 29, 2014); 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did.").

\*\*

Robert does not identify any reversible error in ALJ Rippel's decision or "point to any specific piece of evidence not considered by the Commissioner that might have changed the outcome of his disability claim." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (emphasis omitted). Instead, he urges the Court to reweigh the same evidence that ALJ Rippel considered and to conclude that the ALJ should have found him disabled. *See* Pl.'s Br. 6–12. The Court's role is "to determine whether the ALJ's decision is supported as a matter of fact and law. There were a number of conflicts in the evidence here, and [I cannot] second guess the ALJ in resolving those conflicts." *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). ALJ Rippel's written decision and rationale demonstrate that he "performed an adequate review of the

---

*e.g.*, *Locker*, 2018 WL 4232889, at *7–8; *Ebbert v. Berryhill*, No. 1:17cv193, 2018 WL 5904507, at *8–9 (N.D. W. Va. Sept. 28, 2018), *adopted by* 2018 WL 5892364 (N.D. W. Va. Nov. 9, 2018). And, as Robert concedes, his strong work history does not carry more weight than any other relevant factor or "necessarily entitle[] him to enhanced credibility." Pl.'s Br. 15 (emphasis omitted); *see Corley v. Colvin*, No. 9:12cv2676, 2014 WL 607706, at *5 (D.S.C. Feb. 18, 2014). ALJ Rippel gave at least three legitimate reasons, supported by specific references to relevant evidence in the record, for finding that Robert's symptoms were not as severe or functionally limiting as Robert alleged. R. 31, 33. Thus, his failure to "more precisely articulate[] the role" Robert's work history played in his RFC assessment is not reversible error. *Locker*, 2018 WL 4232889, at *8; *see also Jones v. Colvin*, Civ. No. 1:12cv2894, 2013 WL 5883382, at *12 (D.S.C. Oct. 30, 2013).

16

whole record and that the decision [to deny benefits] is supported by substantial evidence." *Id.*

## IV. Conclusion

For the foregoing reasons, I find that the ALJ's decision is supported by substantial evidence, and I respectfully recommend that the presiding District Judge **GRANT** the Commissioner's motion for summary judgment, ECF No. 15, **AFFIRM** the Commissioner's final decision, and **DISMISS** the case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: July 8, 2021

Joel C. Hoppe
United States Magistrate Judge

17